**GENERAL ELECTRIC COMPANY,**
**Petitioner,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, National Oceanic and Atmospheric Administration, Respondent,**

**American Forest and Paper Association Inc., et al., Intervenors.**

**Nos. 96–1096, 96–1101, 96–1102, 96–1103, 96–1104 and 96–1105.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1997.

Decided Nov. 18, 1997.

---

E. Edward Bruce, Washington, DC, argued the cause for the non-insurance petitioners. With him on the briefs were James R. Bieke, G. William Frick, Philip A. Cooney, Dean A. Calland, Thomas B. Smith, Harold E. Mesirow, James L. Connaughton, David F. Zoll, Ronald A. Shipley, Christina Franz, L. Charles Landraf, Linda K. Breggin, and Cynthia H. Evans.

Marilyn L. Lytle, New York City, argued the cause and filed the briefs for petitioners American Institute of Marine Underwriters and Water Quality Insurance Syndicate.

Monica P. Medina, General Counsel, U.S. Department of Commerce and Naikang Tsao, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for respondent. On the brief were Lois J. Schiffer, Assistant Attorney General, and Eileen T. McDonough, Attorney.

Peter H. Lehner, New York City, argued the cause for intervenor Natural Resources Defense Council, Inc. With him on the brief was Sarah Chasis.

Thomas S. Udall, Attorney General, State of New Mexico, Charles de Saillan, Assistant Attorney General, Santa Fe, NM, and Charles E. Magraw, Assistant Attorney General, State of Montana, Helena, MT, were on the brief for amici curiae State of New Mexico, et al.

Before: SILBERMAN, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Seventeen months after the oil tanker Exxon Valdez ran aground in Prince William Sound, spilling almost eleven million gallons of North Slope crude, Congress enacted the Oil Pollution Act of 1990 to make parties responsible for oil spills liable for damage to natural resources. In this case, we consider both procedural and substantive challenges to the final rule that the National Oceanic and Atmospheric Administration issued pursuant to the Act. Concluding that the final rule's authorization for removal of residual oil suffers from a lack of reasoned decisionmaking, we vacate this portion of the rule and remand to the agency for further consideration. With the agency's consent, we also vacate and remand the final rule's authorization for recovery of legal fees. In all other respects, we sustain the final rule.

I

Prior to the Oil Pollution Act of 1990, Pub.L. No. 101–380, 104 Stat. 486 (codified at 33 U.S.C. §§ 2701–20, 2731–37, 2751–53, 2761 (1994)) ("OPA"), natural resource damages resulting from oil spills were assessed pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub.L. No. 96–510, 94 Stat. 2767 (codified as amended in scattered sections of the U.S.C.), *amended by* the Superfund

Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986) ("CERCLA"), which authorizes "trustees" (e.g., federal, state, or local officials) to assess and collect damages from all types of environmental polluters. In *Kennecott Utah Copper Corp. v. United States Dep't of the Interior,* 88 F.3d 1191 (D.C.Cir.1996), and *Ohio v. United States Dep't of the Interior,* 880 F.2d 432 (D.C.Cir.1989), we reviewed and largely sustained the natural resource damage assessment regulations that the Interior Department issued pursuant to CERCLA.

OPA focuses specifically on oil discharges in the nation's waterways and along its coastlines. Amending the Clean Water Act, section 4201(a) of OPA directs the President, who has since delegated his authority to the Environmental Protection Agency and the Coast Guard, to remove spilled oil. 33 U.S.C. § 1321(c)(1). Section 1002, the primary focus of this litigation, makes responsible parties liable for "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage." *Id.* § 2702(b)(2)(A). Only a "trustee" appointed by either the President, a governor, the governing body of an Indian tribe, or the head of a foreign government may recover such damages. *Id.* § 2706(a)-(b). The Act limits responsible party liability, *e.g., id.* § 2704(a)(3) (limiting liability of any offshore facility except a deepwater port to removal costs plus $75 million per incident), but if trustees need additional funds for restoration, they can draw upon the Oil Spill Liability Trust Fund, *id.* § 2712(a)(2), a fund financed primarily by a five cent per barrel tax on imported and domestic oil, 26 U.S.C. § 4611(c)(2)(B) (1994).

To facilitate damage recovery, OPA directs the President, acting through NOAA, to "promulgate regulations for the assessment of natural resource damages ... resulting from a discharge of oil." 33 U.S.C. § 2706(e)(1). Natural resource damage assessments made by a trustee in accordance with those regulations "shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding" under OPA. *Id.* § 2706(e)(2).

Engaging in a six-year rulemaking process, which produced proposed rules in 1994, 59 Fed.Reg. 1062 (1994), and in 1995, 60 Fed.Reg. 39,804 (1995), NOAA promulgated its "final rule" governing trustee assessment of natural resource damages in 1996. Natural Resource Damage Assessments, 61 Fed. Reg. 440–510 (1996) (adding 15 C.F.R. §§ 990.10–990.66). The final rule reflects NOAA's determination to accomplish OPA's goals through a restoration-based approach, focusing not merely on assessing environmental damages—the approach taken by CERCLA—but also on developing and implementing plans for restoring and rehabilitating damaged resources or services.

The final rule lays out a three-stage procedure for assessing injuries resulting from oil spills and for developing and implementing plans to restore damaged resources. Termed the "Preassessment Phase," the first stage requires trustees to determine whether they have jurisdiction under OPA to pursue restoration activities and whether actions taken by other agencies have adequately addressed the injuries. This first stage also requires the trustee to collect and analyze pertinent data, prepare a notice of intent to conduct restoration planning activities, and open a publicly available administrative record. 15 C.F.R. §§ 990.41–990.45 (1997).

The second stage, the "Restoration Planning Phase," has two substages. The "injury assessment" substage requires the trustee to determine whether an injury has occurred, whether a "pathway" can be established between the discharged oil and the injury, and whether the injury resulted from the discharge. *Id.* § 990.51(a)-(b). If the trustee determines that the oil discharge caused an injury, the trustee must quantify its degree and spatial and temporal extent, including the amount of services destroyed. *Id.* § 990.52(a)-(b). If that analysis leads the trustee to conclude that the injury requires restoration, the trustee proceeds to the "restoration selection" substage, where the trustee identifies a "reasonable range" of restoration alternatives, evaluating them against several factors, including cost, potential success, risk of collateral injury, and public health and safety. *Id.* §§ 990.53–990.54.

Once the trustee chooses the restoration plan that best restores the value destroyed by the oil discharge, the trustee develops a Draft Restoration Plan, setting forth the injury assessment procedures employed, the nature and extent of injuries resulting from the discharge, the restoration goals, the range of restoration alternatives considered, how the alternatives were evaluated, and which alternatives were chosen. *Id.* § 990.55(b). After giving the public an opportunity to review and comment on the Draft Plan, *id.* § 990.55(a), the trustee ends this stage by developing a Final Restoration Plan, *id.* § 990.55(d).

In the third and final stage of the process, the "Restoration Implementation Phase," the trustee presents a written demand for payment to the owner of the tanker or other party or parties responsible for the oil discharge. *Id.* § 990.62(a). If the responsible party refuses to satisfy the demand within ninety days, or if the trustee and the responsible party cannot agree on an alternative figure, the trustee may sue the responsible party or seek an appropriation from the Oil Spill Liability Trust Fund. *Id.* § 990.64(a). In any suit filed by the trustee, its damage assessment is entitled to a rebuttable presumption, *id.* § 990.13, if the trustee can demonstrate that its assessment procedures are "capable of providing assessment information of use in determining the type and scale of restoration appropriate for a particular injury," *id.* § 990.27(a)(1), that any additional cost of a "more complex procedure" reasonably relates to the expected increase in the quantity or quality of information, *id.* § 990.27(a)(2), and, most important, that its assessment procedures are "reliable and valid for the particular incident," *id.* § 990.27(a)(3).

Pursuant to section 1017(a) of OPA, which allows interested persons to petition this court to review any OPA regulation within ninety days of its promulgation, 33 U.S.C. § 2717(a), two groups of petitioners filed separate challenges to the final rule. The first group, the "industry petitioners," consists of General Electric, American Petroleum Institute, Beazer East, Chemical Manufacturers Association, Rhone–Poulenc, Zeneca Hold-

ings, Stauffer Management, and Atkemix Thirty–Seven, Inc. These petitioners argue that NOAA acted arbitrarily and capriciously by authorizing trustees to employ an assessment technique known as contingent valuation. They also argue that NOAA exceeded its authority by allowing trustees to remove residual sources of contamination, i.e., oil left behind by EPA and the Coast Guard, and to recover monitoring and legal costs from responsible parties. The second group, "insurance petitioners," consists of the American Institute of Marine Underwriters and The Water Quality Insurance Syndicate. They argue that the final rule is improperly retroactive and that it violates OPA because it authorizes trustees to recover what are known as passive-use values, fails to reiterate OPA's damage limitation provisions, impairs responsible parties' right to seek contribution under OPA, and grants trustees "uncontrolled discretion." Thirteen states, as amici, and the Natural Resources Defense Council, as intervenor, defend NOAA's final rule. We consider petitioners' arguments in turn, beginning in section two with those advanced by industry petitioners. In section three, we address three issues raised by industry petitioners which, in view of representations NOAA made during these proceedings, are now resolved. We take up insurance petitioners' arguments in section four. Where appropriate, we employ *Chevron*'s two-step analysis, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), and the Administrative Procedure Act's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A) (1994).

II

■ We begin with section 990.13's rebuttable presumption. Relying on our decision in *Chemical Mfrs. Ass'n v. Department of Transp.*, 105 F.3d 702 (D.C.Cir.1997), industry petitioners argue that rebuttable presumptions are appropriate only when proof of one fact renders the existence of another fact so likely that assuming the existence of the inferred fact is both sensible and time-efficient. *Chemical Manufacturers*, however, applies only to rebuttable presumptions created by agencies and has no applicability

where, as here, Congress created the presumption. *Id.* at 705 (legislative bodies, unlike administrative bodies, are "free to adopt presumptions for policy reasons").

Industry petitioners also argue that the rebuttable presumption gives trustees a "powerful advantage" in any subsequent litigation and that the agency must issue regulations that are sufficiently "sound and credible" to deserve the presumption. Petitioners, however, cite no authority for this latter proposition, nor do they explain why the final rule's reliability and validity requirement would not satisfy their "sound and credible" standard. More important, it is not at all clear that the rebuttable presumption even gives trustees a "powerful advantage." In the final rule's preamble, NOAA "interprets" the rebuttable presumption as imposing upon responsible parties "the burdens of presenting alternative evidence on damages and of persuading the fact finder that the damages presented by the trustees are not an appropriate measure of damages." 61 Fed. Reg. at 443. As agency counsel described it at oral argument, the rebuttable presumption thus functions as nothing more than a "burden shifting exercise." Whatever the rebuttable presumption means and however it will work in practice, issues we need not resolve at this time, one thing is clear—before trustees can take advantage of the presumption, they must prove that their damage assesments are "reliable and valid for the particular incident." 15 C.F.R. § 990.27(a)(3).

We turn to industry petitioners' specific challenges to the final rule.

*Contingent Valuation and Passive Use Values*

In valuing damage to natural resources caused by oil discharges, trustees may consider two types of losses: active and passive. "Active-use" losses refer to the loss of actual use of a natural resource. An oil spill that contaminates a National Seashore, for example, causes an "active-use" loss for those unable to use the beach for swimming or fishing. Under the final rule, the trustee develops a plan to restore the beach to its original condition and, while restoration takes place, to provide alternative fishing, swimming and other active-use opportunities.

NOAA's final rule also authorizes recovery of what are known as nonuse or "passive" losses, the value individuals place upon the existence of natural resources, even if they never plan to make active use of them. In the case of the National Seashore, for example, people who have never used the beach may nevertheless value its existence. To assess this value, researchers employ a survey technique known as "contingent valuation," in which they create a hypothetical market and ask people—survey respondents—how much they would pay to preserve or protect a given resource. Averaging the responses, researchers then determine the value the public places on the resource. *See* Jeffrey C. Dobbins, Note, *The Pain and Suffering of Environmental Loss: Using Contingent Valuation to Estimate Nonuse Damages,* 43 DUKE L.J. 879, 882 (1994).

Because contingent valuation is not without controversy, NOAA commissioned a special panel to study the technique and report on its appropriateness for assessing natural resource damage. *See* 58 Fed.Reg. 4601, 4602–14 (1993) (Appendix I—Report of the NOAA Panel on Contingent Valuation). After considering the critiques of contingent valuation, the panel, which included two Nobel laureates, concluded that if properly conducted under strict guidelines, the technique can convey useful and reliable information that "can produce estimates reliable enough to be the starting point of a judicial process of damage assessment." *Id.* at 4610. Based on the panel's report, NOAA's first proposed rule explicitly authorized trustees to employ contingent valuation and provided detailed standards for using it. 59 Fed.Reg. at 1182–84. In its next proposed rule, however, and then again in its final rule, NOAA omitted all references to contingent valuation, instead authorizing trustees to choose whichever assessment techniques they wish, subject to section 990.27's requirements, including reliability and validity for the particular incident. In appendix B to the final rule's preamble, NOAA included contingent valuation on a list of techniques trustees could choose to utilize. 61 Fed.Reg. at 499. Describing its decision

to provide trustees with such discretion, the agency said this:

> NOAA believes that the standards set forth in § 990.27 are sufficient to allow trustees and responsible parties to determine the acceptability of a particular assessment procedure for a given incident. NOAA supports the use of all of the procedures discussed in Appendix B of the preamble as reliable and valid within the appropriate context and when performed in accordance with accepted professional practices. NOAA does not believe that the rule should set forth specific standards regarding the implementation of individual procedures, as it is not feasible to prescribe all valid uses of these procedures. The validity and reliability of procedures will depend on the circumstances of particular incidents. . . . Thus, NOAA believes that most of the comments received, which relate to potential problems with certain applications of these procedures, will be dealt with in the context of specific incidents.

*Id.* at 470.

■ Industry petitioners argue that NOAA acted arbitrarily and capriciously by "ignoring" the panel's warning that contingent valuation studies must be conducted subject to stringent standards. Relying on our *Kennecott* decision, NOAA responds that this argument is not ripe for judicial review because the preamble's reference to contingent valuation neither imposes a legal obligation upon petitioners nor has any immediate effect upon them. While this argument has force with respect to petitioners' temporary loss argument, see discussion *infra* at 774, it has no applicability to their purely procedural challenge. The question we faced in *Kennecott*—whether the Interior Department exceeded its CERCLA authority by arguably authorizing recovery of certain damages through language in the regulation's preamble—was not ripe because whether Interior had intended to bind anyone with the preamble's language was not at all clear. Until a trustee invoked the preamble to affect the outcome of a real dispute, we held, we lacked both the need and the factual

basis for resolving the question. *Kennecott,* 88 F.3d at 1222–23.

Industry petitioners' purely procedural argument, that NOAA failed to consider relevant comments during the rulemaking process, is quite different. Unlike in *Kennecott,* where our treatment of the preamble issue would have benefitted from a "concrete case," *id.* at 1223, we now know everything we need to know about NOAA's treatment of the administrative record. The issue petitioners present will never be more fit for review.

Industry petitioners' argument fails, however. NOAA ignored neither the panel's comments nor the criticisms of contingent valuation that the panel considered. It simply gave trustees discretion to use contingent valuation, so long as the technique produces, as required by section 990.27(a)(3), valid and reliable results for the particular incident. Documenting its findings in the record, NOAA reasonably concluded not only that prescribing standards for using all possible assessment procedures in all possible situations would be infeasible, but also that general standards, such as those included in section 990.27, can adequately ensure that trustees do not abuse their discretion. If a responsible party in a particular case believes that a trustee using contingent valuation has produced either unreasonable or invalid results for the specific incident, it can withhold payment, forcing the trustee to file suit under section 990.64 and to establish validity and reliability under section 990.27 in order to gain the rebuttable presumption.

■ Going beyond their procedural claim, industry petitioners argue that NOAA acted arbitrarily and capriciously by failing to bar contingent valuation altogether. Because this argument amounts to a facial challenge to the final rule that does not depend on the facts of a particular case, it is, like petitioners' purely procedural argument, ripe for review. But also like that argument, it fails. We held in *Ohio* that the Interior Department had not acted arbitrarily or capriciously by authorizing CERCLA trustees to use contingent valuation. *Ohio,* 880 F.2d at 478. Not only does nothing in the panel report or any other portion of the administrative rec-

ord cast doubt on *Ohio,* but the panel report itself found that if performed correctly, contingent valuation can produce both useful and reliable results. 58 Fed.Reg. at 4610.

■ Industry petitioners next argue that NOAA acted arbitrarily by authorizing the recovery of passive-use values for temporary losses of natural resources. According to petitioners, passive-use losses occur only where resources are lost forever; temporary losses, they claim, can never give rise to passive-use losses. Although the administrative record lends support to NOAA's contention that temporary losses can cause loss of passive-use values, *e.g., id.* at 4608 (CV panel concluding that "interim passive-use values are additive over time"), we agree with NOAA that this issue is not ripe for judicial review. The proper time to address the question will come if and when a trustee actually assesses damages for temporary losses in a particular case. Unlike industry petitioners' purely procedural argument and their challenge to NOAA's refusal to bar trustee use of contingent valuation, right now we lack both the factual record and the detailed findings needed to resolve their temporary loss argument.

### Removal Authority

■ Section 990.53(b)(3)(i) of the final rule authorizes trustees to "[r]emove conditions that would prevent or limit the effectiveness of any restoration action (e.g., residual sources of contamination)." 15 C.F.R. § 990.53(b)(3)(i). Explaining this provision, NOAA poses an example of a trustee needing to remove residual oil—oil left behind by EPA or the Coast Guard—in order to implement a restoration plan to replant or reseed vegetation. Without removal authority, NOAA claims, the trustee would be unable to reseed or replant the area contaminated by the residual oil, leaving restoration incomplete.

Industry petitioners argue that because OPA delegates sole responsibility for oil removal to the President, NOAA exceeded its statutory authority by authorizing trustees to remove residual oil. In support of their argument, petitioners point out that OPA treats restoration and removal separately

and for each contains distinct definitional, limitation, and liability provisions. 33 U.S.C. § 2701(30) (defining "removal"); § 2706(d) (defining "natural resource damages"); § 2702(b) (liability provisions); § 2717(f) (statute of limitation provisions). They also rely on section 1011 of OPA, which requires the President to:

> [c]onsult with the affected trustees designated under .section 2706 of this title on the appropriate removal action to be taken in connection with any discharge of oil. For the purposes of the National Contingency Plan, removal with respect to any discharge shall be considered completed when so determined by the President in consultation with the Governor or Governors of the affected States. However, this determination shall not preclude additional removal actions under applicable State law.

*Id.* § 2711. From these provisions, industry petitioners conclude that it is the President, acting through EPA or the Coast Guard, who determines when removal is complete, and that OPA limits the role of trustees in removal operations to consultation with EPA and the Coast Guard.

We would ordinarily analyze NOAA's interpretation of OPA under *Chevron,* asking first whether Congress spoke clearly to the issue or, if not, whether NOAA's interpretation of the statute is permissible and thus entitled to deference. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. The parties disagree about whether NOAA is even entitled to *Chevron* deference given the primary role that EPA and the Coast Guard play in oil removal. *See, e.g., Rapaport v. United States Dep't of Treasury,* 59 F.3d 212, 216–17 (D.C.Cir.1995) (holding that the Office of Thrift Supervision receives no deference for its interpretation of the Federal Deposit Insurance Act because it shares the administration of the statute with other agencies). We need not resolve this dispute, however, or even the underlying question of statutory authority because, by not explaining the difference between the residual removal authority of section 990.53(b)(3) and the language of the proposed .rule, NOAA failed to exercise reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*

*Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (agency must provide a reasoned basis for its actions). The proposed rule provided that trustees, "[w]hen identifying primary restoration alternatives to be considered," should determine whether "[c]onditions exist that would limit the effectiveness of primary restoration actions (e.g., residual sources of contamination)." 60 Fed. Reg. at 39,832. As we read this provision, it did no more than encourage trustees to develop restoration plans not requiring removal of residual oil. Thus, if the trustee in NOAA's revegetation example found that oil left behind by EPA made revegetation impossible, the trustee would have to abandon the project and develop another restoration alternative.

NOAA argues that under the proposed rule, the trustee could have actually removed the oil, but we think this contention conflicts with the proposed rule's plain language, which merely directs trustees to "consider" whether conditions exist that would make the primary restoration alternative impractical. By comparison, the final rule quite clearly authorizes trustees to "[r]emove conditions that would prevent or limit the effectiveness of any restoration action (e.g., residual sources of contamination)." 15 C.F.R. § 990.53(b)(3)(i). Yet nowhere has the agency explained this change. Indeed, NOAA's only comment on the final version of section 990.53(b)(3) in the rule's preamble quotes verbatim from the proposed rule. *See* 61 Fed.Reg. at 452 ("trustees should consider whether activities exist that would prevent or limit the effectiveness of restoration actions (e.g., residual sources of contamination).").

Not only has NOAA failed to explain this difference between the final rule, on the one hand, and its preamble and the proposed rule, on the other, but it has also not explained the interrelationship between trustees' residual removal authority and the primary removal authority of EPA and the Coast Guard. If trustees are to have residual removal authority, clearly explaining how and under what circumstances they will exercise such authority is critical, particularly since OPA requires the President to consult with trustees during primary removal ac-

tions. 33 U.S.C. § 2711. How, for example, does the standard governing the President's primary removal authority differ from the standard governing trustee residual authority? What precisely is a trustee's role in primary removal, and what is the role of EPA and the Coast Guard, if any, with respect to a trustee's residual authority? May trustees remove residual oil even if EPA or the Coast Guard has considered and rejected a trustee's position during the consultation process? What happens if a trustee originally agrees with the extent of primary removal, but later changes its mind? NOAA must answer these questions if it intends to give trustees residual removal authority. We also expect that a reviewing court will want to know not only that EPA and the Coast Guard agree that trustees should have residual removal authority, but also that the three agencies concur as to how they will coordinate removal activities. Because NOAA failed to address these central issues and to explain the difference between the proposed and final rules, we vacate section 990.53(b)(3)(i) and remand for further agency action.

*Monitoring Costs and Legal Fees*

Section 990.30 of the final rule defines reasonable assessment costs to include both "monitoring and oversight costs" as well as "administrative, legal, and enforcement costs." 15 C.F.R. § 990.30. Industry petitioners first contend that NOAA acted arbitrarily by including monitoring costs—the costs associated with trustee monitoring of the implementation of restoration plans and their environmental consequences—as an element of assessment costs. Relying on adjacent OPA sections dealing with the Oil Spill Liability Trust Fund, they point out that one section, which makes the Fund available for payment of removal costs, explicitly mentions monitoring costs, 33 U.S.C. § 2712(a)(1), while the other, which makes the Fund available for restoration actions, contains no reference to monitoring costs, *id.* § 2712(a)(2). According to petitioners, the difference between these two sections shows that Congress intended to exclude monitoring costs from costs recoverable in restoration actions.

We are unpersuaded. While monitoring costs do appear in one section but not the other, these provisions deal only with appropriate uses of the Fund, not with costs properly recoverable from responsible parties. Moreover, the two provisions are not parallel. The former refers only to "removal costs," while the latter refers to a significantly broader activity—"developing and implementing plans." Because plan implementation necessarily includes monitoring, it is far from clear that Congress would have thought it necessary to provide explicitly for the recovery of monitoring costs in the latter provision. More important, OPA's only provision defining the measure of natural resource damages recoverable under OPA contains no reference at all to monitoring costs.

Because OPA is silent on the question before us, we proceed to *Chevron*'s second step, where we have no doubt that NOAA acted reasonably by authorizing the inclusion of monitoring costs as part of restoration costs. According to NOAA, monitoring is an essential element of restoration:

> NOAA believes that restoration monitoring costs are a recoverable component of natural resource damages. Monitoring is essential to ensure that restoration actions accomplish their intended goals and objectives and do not cause unanticipated harm to the environment or public health. In addition, monitoring is essential to determine whether the terms of restoration agreements have been met, upon which a release from liability is premised.

61 Fed.Reg. at 491. Not only does this conclusion seem eminently reasonable to us, but industry petitioners have suggested no reason for excluding monitoring costs from the cost of restoration.

We are equally unpersuaded by industry petitioners' argument that, because monitoring takes place after assessment, NOAA improperly included monitoring costs as a component of assessment costs. In view of our conclusion that NOAA acted reasonably by including monitoring costs as a recoverable cost, the precise heading under which the trustee may recover monitoring costs seems insignificant, particularly since industry petitioners have given no reason why it makes any difference at all.

Relying on *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), industry petitioners also challenge section 990.30's definition of assessment costs as including attorneys' fees. NOAA both concedes this point and advises us that it does not oppose vacatur of the definition of assessment costs to the extent that it refers to attorneys' fees incurred in pursuing litigation of a natural resource damages claim.

NOAA's concession does not end this matter, however, because the parties continue to disagree about what other legal costs trustees may recover. Although both sides agree that trustees may recover assessment costs attributable to tasks that lawyers happen to perform but which others, such as engineers or private investigators, could have performed, they disagree about whether trustees may recover costs stemming from legal work not directly in furtherance of litigation (e.g., pre-litigation legal opinions, title searches) that only lawyers could have performed. In view of NOAA's consent to vacatur of this portion of the rule, we decline to resolve this question, instead leaving it to NOAA to draw the precise line between recoverable and nonrecoverable legal costs in subsequent rulemaking.

### III

Industry petitioners present several other challenges to the final rule which, in view of representations made by NOAA in its brief and during oral argument, have been resolved. In order to document the agency's representations, we summarize each issue briefly and include relevant oral argument excerpts in the appendix to this opinion.

In their opening brief, industry petitioners argued that section 990.51 of the final rule, which they read to require the trustee to demonstrate only "injury," "exposure," and "pathway," Brief for Industry Petitioners at 41, would allow trustees to assess liability without evidence that the responsible party actually caused the oil discharge that did the damage, thus violating OPA's causation re-

quirement. *See* 33 U.S.C. § 2702(a) (responsible parties only liable for damages that "result from" an oil discharge). NOAA responded by pointing to section 990.51(a)'s requirement that trustees must "determine if injuries to natural resources and/or services have resulted from the incident," claiming that it establishes an independent causation requirement. Brief for Respondent at 59 ("[T]he trustee must establish causation to the satisfaction of the district court before liability can be imposed."). At oral argument, agency counsel reiterated her understanding that trustees must prove causation, acknowledging that this interpretation of the final rule would bind the agency in any future proceedings. *See* Appendix at 780-81.

The parties also now agree on the correct interpretation of section 990.53(d)(3)(ii), which provides that when a trustee determines that the valuation of lost services is practical but, due to considerations of cost or time, the valuation of replacement resources or services is not practical, "trustees may estimate the dollar value of the lost services and select the scale of the restoration action that has a cost equivalent to the lost value." 15 C.F.R. § 990.53(d)(3)(ii). Originally taking issue with the word "estimate," industry petitioners claimed that it conflicted both with the immediately preceding provision which directs trustees to "explicitly measure" the value of injured resources and services, *id.* § 990.53(d)(3)(i), and with a statement in the rule's preamble allowing trustees, in situations where valuing replacement services or resources is impractical, to "calculate" the value of the injured services or resources and then select the scale of the restoration action that has a cost equivalent to the lost value. 61 Fed.Reg. at 453. According to NOAA, its use of three different terms—"measure," "calculate," and "estimate"—has no significance because it used the words interchangeably. Brief for Respondents at 54. To NOAA, the terms all mean the same thing. Indeed, Webster's Third New International Dictionary defines "calculate" as "to reckon by exercise of practical judgment rather than by strict mathematical process: ESTIMATE." At oral argument, agency counsel confirmed NOAA's view that "estimate" means "calculate." *See* Appendix at 782.

The parties' final area of agreement relates to section 990.27(b), which provides that the range of assessment procedures available to trustees includes, but is not limited to, field procedures, laboratory procedures, model-based procedures, and literature-based procedures. 15 C.F.R. § 990.27(b)(1)(i)–(iv). According to section 990.27(b)(2) of the final rule, trustees may use these procedures alone or in any combination. Petitioners argued that because model-based procedures require no site-specific data or evidence of injury, the use of these models by themselves, as authorized by the final rule, would violate OPA's requirement that trustees develop site-specific restoration plans. 33 U.S.C. § 2706(c)(1)(C) (trustees must "develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship"). Responding that this argument rests on a misunderstanding of the final rule, NOAA explained that although trustees may use simplified procedures to assess damages, they may not, under the final rule, avoid developing site-specific restoration alternatives, *see* 15 C.F.R. § 990.53(a)(2) ("Trustees must consider a reasonable range of restoration alternatives.... Each restoration alternative is comprised of primary and/or compensatory restoration components that address one or more specific injury(ies) associated with the incident."), unless, of course, a regional restoration plan or project already exists. *Id.* § 990.56. At oral argument, we asked agency counsel whether, if a trustee has used simplified methods to come up with a number representing the damages caused by an oil spill, the trustee could then simply send the responsible party a bill for that amount, or whether instead the trustee would have to develop an actual site-specific plan to restore the lost value. Counsel responded, and NRDC counsel agreed, that the final rule permits only the latter course of action, i.e., that the trustee could not send the responsible party a bill based solely on the number derived from a simplified model, but would have to develop a site-specific restoration plan or rely on an existing plan. *See* Appendix at 782–87.

## IV

This brings us finally to the arguments advanced by insurance petitioners. Lacking merit, they require but brief discussion.

■ To begin with, petitioners have no standing to argue that section 990.20(b), which allows trustees who have begun damage assessments under CERCLA to switch to the final rule, is impermissibly retroactive. They make no claim that any particular trustee has switched to the final rule, nor have they argued, as they could not at this time, that such a switch resulted in a trustee imposing greater damages upon a responsible party insured by petitioners. Because petitioners have thus shown neither concrete nor imminent injury, *see Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1383 (D.C.Cir.1996), challenge to this section must wait until a trustee actually switches assessment procedures and imposes heavier damages on a responsible party.

■ Pointing to section 1002(b)(2)(A) of OPA, which makes responsible parties liable for "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources," 33 U.S.C. § 2702(b)(2)(A), and to section 1006(d)(1)(B), which defines "natural resource damages" as "the diminution in value of those natural resources pending restoration," *id.* § 2706(d)(1)(B), insurance petitioners argue that OPA does not authorize recovery of passive-use values. We disagree. Nothing in the plain language of sections 1002 or 1006 excludes passive-use values. These two sections simply provide for recovery of diminished value without indicating whether the value is of the active or passive variety. Congress, however, clearly intended to authorize trustees to recover passive-use values. The House Conference Report defines diminution of value as "the standard for measuring natural resource damages used in [*Ohio*, at 462–80]," H.R. Conf. Rep. No. 101–653, at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 786, and *Ohio* explicitly approves passive-use values. *Ohio*, 880 F.2d at 464 ("Option and existence values may represent 'passive' use, but they nonetheless reflect utility derived by humans from a resource, and thus, *prima facie*, ought to be included in a damage assessment.").

■ Insurance petitioners also challenge the final rule because it makes no reference to OPA's liability limits. As NOAA points out, however, nothing in the final rule affects a responsible party's right to invoke the statute's liability limits. If trustees need resources above and beyond statutory limitations to implement restoration plans, they may draw upon the Oil Spill Liability Trust Fund. 33 U.S.C. § 2712(a)(2).

■ Insurance petitioners next argue that, by authorizing trustees to assess costs for restoration activities undertaken after the date of the initial demand, the final rule violates responsible parties' rights under OPA to seek contribution from other responsible parties. Their concern stems from section 1017(f)(3), which prohibits bringing contribution actions more than three years after either the date of judgment in any action under OPA for recovery of costs or damages, or the date of entry of a judicially approved settlement with respect to those costs. *Id.* § 2717(f)(3). Petitioners argue that if trustees impose costs for restoration activities undertaken more than three years after initial settlement, responsible parties will be unable to seek contribution. Petitioners' concerns are unfounded. For one thing, the final rule requires trustees to estimate future monitoring costs and discount them to present value before demanding payment from responsible parties. 15 C.F.R. § 990.63(a). Even if trustees demand payment for activities undertaken more than three years after initial settlement, responsible parties can refuse payment, thus forcing trustees to bring a judicial action and to obtain another judgment, which would trigger the running of another three-year period during which responsible parties may bring another contribution action.

■ Insurance petitioners' argue finally that the final rule grants trustees "uncontrolled discretion." But we think section 990.27's requirement that plans be "reliable and valid for the particular incident" adequately constrains trustee discretion, giving reviewing courts the authority they need to

ensure the accuracy and reasonableness of natural resource damage assessments.

V

We vacate section 990.30's definition of "reasonable assessment costs" to the extent that it includes legal fees, and section 990.53(b)(3)(i)'s authorization of residual removal authority. We adopt NOAA's construction of section 990.51 (trustee must prove causation), section 990.53(d)(3)(ii) ("estimate" means "calculate"), and section 990.27(b) (trustee must develop site-specific restoration plans). In all other respects we uphold the final rule.

*So ordered.*

## Appendix

### Excerpts from September 11, 1997 Oral Argument *

*Causation*

THE COURT: Do I understand, do we understand that the parties are in agreement on this issue?

MS. MEDINA: I'm not sure I would characterize this "in agreement." I guess I would say that we have determined—

THE COURT: I read your brief as conceding that Petitioner was dead right and pointed out your regulation was never intended to avoid causation.

MS. MEDINA: Absolutely. To prove legal causation, to prove liability. That is something for the Court to do. All the regulation requires is that we prove that the spill, the injury was derived from or resulted from the spill.

THE COURT: Wait a minute. Now I don't understand. You mean is the Government's—the trustee can come in and say look, there was a spill. I've shown it caused terrible problems. Now it's up to you, your Honor, to determine who did it.... That is not correct, is it?

MS. MEDINA: That is not correct.

* Ms. Medina is counsel for NOAA. Mr. Tsao, an attorney with the Natural Resources Division of the Department of Justice, also appeared on behalf of NOAA. Mr. Lehner appeared for NRDC. Mr. Bruce appeared for industry petitioners.

THE COURT:     So you have to show causation.

MS. MEDINA:    We do have a responsible party on the other side of the table.

THE COURT:     You have to show causation as part of your case.

MS. MEDINA:    Yes, we do, absolutely, but we don't have to do it as part of our rule, as a part of our process in assessing the damages.

THE COURT:     That's not—I think the Petitioner quite legitimately read the rule as suggesting that there was some effort to avoid the obligation to show causation and the Government comes in, as often happens on a direct challenge to rulemaking, says no, we didn't intend that. That was— now, what is important and we have done this on a couple of occasions, your brief then agrees with Petitioner and says look—agrees in the sense that we never intended the rule to mean that.

MS. MEDINA:    Right.

THE COURT:     We mean the same thing you think it should mean.

MS. MEDINA:    Right.

THE COURT:     That now, whenever it's reflected in our opinion, then binds the Agency, does it not?

MS. MEDINA:    Yes, it does.

*Estimates*

THE COURT: Your position is that estimate means calculate?

MS. MEDINA: Yes, Your Honor.

THE COURT: Explicitly measure means being very precise; estimate means a little general and calculate means both is that it?

MS. MEDINA: I think we used the words very much interchangeably. We didn't intend there to be this huge distinction.

THE COURT: So I think Judge Silberman's question of an earlier issue if we write an opinion and say we understand the word "estimate" in the regulation to mean "calculate" that's something the Agency—it would be consistent with your understanding of the issue?

MS. MEDINA: Yes, Your Honor.

THE COURT: Okay, that's it. So calculate and measure are equivalent?

MS. MEDINA: Yes, Your Honor.

*Simplified Procedures*

THE COURT: [D]o I understand it works this way? A simplified method is a computer program of some kind that takes account of inputs, I assume, that come from the site of the oil spill. Is that right?

MS. MEDINA: Yes.

THE COURT: Okay, so it's not just a book you look into like a logarithm table and say the answer is X. You've had input regarding the conditions at the oil spill site, right?

MS. MEDINA: Right.

THE COURT: Okay ... let's assume that that formula, once you take account of the site specific things produces a figure of $100,000 worth of damage. All right?

MS. MEDINA: Right.

THE COURT: Okay, are there any circumstances under which that is the end of the process?

MS. MEDINA: I would think that we would still develop a plan.

THE COURT: No, no, don't tell me what you think. I want to know what the regulations say. Are there any circumstances under the regulation under which a trustee would send that $100,000 bill to the responsible party?

MS. MEDINA: No ...

THE COURT: Okay, let me go back to my intermediate question. Are there any circumstances under which the $100,000 calculation that flows from the computer model that's based on site specific data would be the end of the process, that that's the bill that you send to the responsible party?

MS. MEDINA: That's not the end of the process. We then develop a plan ...

THE COURT: ·What function does the simplified procedure serve under the rules? ... In other words, the tanker spilled X gallons of oil off Juneau, Alaska. Look at our model to see what that means in terms of damage, bang, that's our simplified assessment. And what do you do with it then?

MR. TSAO: Then you need to develop and implement a plan to figure out how you're going to compensate for that injury and as you asked before, what you end up deciding in terms of restoration plan could be greater or less than $100,000 that comes out of the simplified procedure. There's no absolute requirement that it be the same....

MR. LEHNER: [T]o give you an example of how models work, in my prior life I actually was involved in mini-oil spills. You will have a circumstance,, for example, big oil spill where the trustees contract with people, go out, find out the actual extent of the oil, how many birds are dead, what percentage of the grass in the wetlands is dead, et cetera, and then try to develop a restoration plan accordingly.

You can also use in a smaller spill a model to help you do that. You put in the inputs of the amount of oil of the geographic area and they will come up with estimates of the biological injury, the type of biological injuries and also using their economic data base, the approximate costs of those. The trustees can then use the simplified assessment method, the model to develop a restoration plan.

THE COURT:     So that's just stage 1, right?

MR. LEHNER:     The assessment is stage 1 in the stage.

THE COURT:     You have to go on to stage 3?

MR. LEHNER:     Yes, stage 2 is letting the feds help out the states, so it's really a two stage— assess and develop a plan and they all have to go to stage 2.

THE COURT:     You develop a plan without a site specific activity?

MR. LEHNER:     The rules provide for regional restoration plans and the Petitioners don't challenge those.  You do need—

THE COURT:     Wait a minute, counsel.  I didn't understand that at all.  What do you mean?

MR. LEHNER:     The rules—you can have a site specific plan or you can—the rules allow a trustee to use what are called regional plans . . .

THE COURT:     What is a regional plan?

MR. LEHNER:     Let me give an example and explain it. In 1990, in the New York Harbor, we had six oil spills, six big oil spills in the first half of the year.  The oil kept the same place again and again and some oil was a little further to the west and a little to the east, but it was all in the same region.

What the trustees recognized is that it was absurd to develop six entirely sepa-

rate plans in those cases. We could use one plan to address all the different spills. They were all site specific for their specific region, but it doesn't make sense to try to distinguish where you can't.

So what the rules do allow in our view is you can use a model and then if there is a regional plan, perhaps you can use that, but you have to do—you do have to come up with a plan. That's what the statute makes clear and that's what the regs make clear....

THE COURT: Do you really have as much problem with that after you heard the Government's position?

MR. BRUCE: Well, if the Government's position were written into the rules the way the Government has articulated its position here in Court today, I don't know what our position would have been, but that's not what the rules say. The rules explicitly incorporate the Type A, DOI models. They allow other models as well, but they explicitly incorporate Type A DOI models ...

THE COURT: What's so terrible about the DOI—

MR. BRUCE: No, no. I just want to tell you what they do. The DOI models and this is 61 Fed.Reg. at page 20562 describing those models that were actually published after the NOAA's rule, they say "when trustees use a Type A procedure, that's the model, they perform injury determination, quantification and damage determination through a computer model." Keep that in mind, damage determina-

tion. That's the number that comes out. It's not an assessment. It's a—

THE COURT: Oh, but in the regulation it's only an assessment?

MR. BRUCE: No, no. The Type A models are designed to put out a number that is the whole shooting match, the whole thing, and that's what these rules do. That's what—

THE COURT: If we don't read them that way and the Agency certainly, the Government certainly hasn't suggested that in their argument here, then you don't have a problem. The fact that they're using computers and starting with the simplified method—that can't possibly be your objection.... Your objection is if they were going to impose, come to Court, seek damages based on a computer without real hard evidence.

MR. BRUCE: Alone. That's correct.

THE COURT: And without any development of a plan.

MR. BRUCE: Without anything else. That's what the rule allows them to do. Now if they've abandoned that position, if they've walked away from that and somehow through the adjudicatory process they can do that and the Court so holds, we don't have an argument.